FOR THE

COUNTIES OF FRANKLIN AND HAMPSHIRE, SEPTEM-
BER TERM 1865, AT GREENFIELD.

———

PRESENT:

Hon. GEORGE T. BIGELOW, Chief Justice.
Hon. CHARLES A. DEWEY, ⎱
Hon. REUBEN A. CHAPMAN, ⎰ Justices.
Hon. HORACE GRAY, Jr.,

## FRANKLIN COUNTY.

Commonwealth *vs.* Jerome V. C. Smith & others.*

A railroad corporation is not authorized by common law to mortgage its franchise, withou further authority than is conferred by its act of incorporation.

Corporations have the power by common law to issue bonds. But since *St.* 1854, *c.* 286 railroad corporations in this commonwealth have no power to issue bonds for the payment of money, except for the purposes and in the mode therein authorized; and all bonds issued otherwise are void, and a mortgage to secure such bonds is also void.

Although a railroad corporation which has issued such invalid bonds and mortgage does not seek to repudiate them, one who has taken a valid second mortgage which contains no covenants of warranty, but is not made expressly subject to the former mortgage, may take advantage of their invalidity.

Such second mortgagee has a plain, adequate and complete remedy at law, and therefore cannot maintain a bill in equity to procure the cancellation of the first mortgage, and thus remove a cloud upon his title.

* This case was argued in Boston, in February 1865, before BIGELOW, C. J., and DEWEY, HOAR, CHAPMAN and GRAY, JJ.

BILL IN EQUITY seeking to impeach the validity of a mortgage, executed on the 30th of July 1855 by the Troy and Greenfield Railroad Company to the defendants as trustees, covering by its terms the franchise, railroad and all other property of the corporation, then owned or thereafter to be acquired, to secure bonds to the amount of $900,000, to be issued to the contractor as part compensation for constructing the railroad, payable in thirty years from date. This mortgage recited the provisions of a contract for the construction of the railroad, dated December 30, 1854, to the effect that such bond should be given ; and it was made subject to a prior mortgage to the Commonwealth, to secure state bonds to the amount of $2,000,000, which the Commonwealth were to issue under the provisions of St. 1854, c. 226.

The following facts were agreed: Since the execution of the mortgage to the defendants, the Commonwealth have received two other mortgages upon the railroad and franchise of the Troy and Greenfield Railroad Company, one of which was dated on the 6th of July 1860, and the other on the 5th of March 1862 ; and also a surrender from the corporation of all their property, subject to redemption under St. 1862, c. 156. On the 4th of September 1862 the Commonwealth took possession of the mortgaged premises in various towns, for breach of condition, in the manner shown by various certificates thereof, which are now immaterial. The Commonwealth under their various mortgages have at various times, from October 1858 to July 1861, advanced to the Troy and Greenfield Railroad Company large sums of money, amounting in all to several hundred thousand dollars. The corporation, under their mortgage to the defendants, have at various times, from August 1855 to July 1861, issued bonds to the amount in all of $600,000, payable in thirty years from date. All of these bonds were issued in good faith, and are held by *bona fide* holders, and the corporation have issued no other bonds than the above. Before advancing any money to the corporation, the Commonwealth had actual notice of the execution of the mortgage to the defendants, and of the fact that a number of bonds had been issued under the same. The

amount of capital stock of the corporation which, in December 1856, had been paid in was $143,905.77.

Upon these facts, and others which are now immaterial, the case was reserved by the chief justice for the determination of the whole court.

*D. Foster,* for the Commonwealth. The mortgage to the defendants has never been sanctioned or ratified by the legislature, and its validity must depend on the question whether the common law powers of railroad corporations in Massachusetts permit them to execute mortgages, and if so to what extent. At common law, a railroad corporation has no power to execute any mortgage. This is clearly the English rule. *Winch* v. *Birkenhead, &c. Railway,* 7 Railw. & Canal Cas. 384. *Beman* v. *Rufford,* Ib. 48. *South Yorkshire Railway, &c.* v. *Great Northern Railway,* 9 Exch. 84. *Shrewsbury, &c. Railway* v. *North Western Railway,* 6 H. L. Cas. 113. It is also the prevailing opinion in this country. *Pierce* v. *Emery,* 32 N. H. 504. *Hall* v. *Sullivan Railroad,* 21 Law Reporter, 138. *Tippets* v. *Walker,* 4 Mass. 595. *Gue* v. *Tide Water Canal Co.* 24 How. 257. *Worcester* v. *Western Railroad,* 4. Met. 564. *Treadwell* v. *Salisbury Manuf. Co.* 7 Gray, 404. *Opinion of Justices,* 9 Cush. 611. *Salem Mill Dam* v. *Ropes,* 6 Pick. 32. The statutes of Massachusetts confer no such authority. *St.* 1854, *c.* 286. Gen. Sts. *c.* 63, §§ 120–123. The *St.* of 1854, *c.* 286,* authorizing the issue of bonds of a

---

* The first three sections of this statute are as follows :

"Sect. 1. Any railroad corporation, established by the laws of this commonwealth, may issue bonds for the purpose of funding its floating debt, or for money which it may borrow for any purpose sanctioned by law; provided, however, that such corporation shall, by a majority of votes at a meeting of its stockholders called for that purpose, be authorized to issue the same, and provided that the bonds so issued shall in no case exceed the amount of capital stock actually paid in by the stockholders of said company.

"Sect. 2. Such bonds may be issued in sums of not less than one hundred dollars each, payable at periods not éxceeding twenty years from the date thereof, and may bear a rate of interest not exceeding six per centum per annum, payable annually or semi-annually.

"Sect. 3. No railroad corporation, having issued any bonds under the provisions of this act, shall subsequently make or execute any mortgage upon its road

certain description and for certain purposes is a virtual prohibi-tion of the issue of any others. *Gelpcke* v. *Dubuque*, 1 Wal-lace, 221.

The bonds issued under the mortgage to the defendants de-part from the statute requirements in many respects. They were issued for an unauthorized purpose. They are payable in thirty years, instead of twenty. They were for an amount greatly exceeding the capital of the company. The bonds being void, the fact that they are held by *bona fide* purchasers is im-material. P&ties who take them are presumed to know the statute law. *Balfour* v. *Ernest*, 5 Jur. (N. S.) 439. *Bissell* v. *Michigan Southern, &c. Railroad*, 22 N. Y. 258. *Pearce* v. *Mad-ison, &c. Railroad*, 21 How. 441. The mortgage must perish with the bonds. It cannot stand as a security for any amount due under the contract for the construction of the railroad. The agreement with the contractor was not to give him valid bonds, but to give him just such bonds as these were. The parties selected a form of security which turns out to be invalid. Under these circumstances, the defendants would not be entitled to have the contract reformed in equity, nor can they set up a supe-rior equity to the Commonwealth in this case. *Hunt* v. *Rous-maniere*, 1 Pet. 1. *Leavitt* v. *Palmer*, 3 Comst. 19.

*S. Bartlett & C. Allen*, for the defendants. Even if it be con-ceded that the franchise to be a corporation and the delegated right of eminent domain are inalienable, there is nothing in the nature of a franchise to operate a railroad which is of that char-acter. A corporation enters into no contract with the state that it will go on and act under its charter. The security of the state is founded upon the rules which it prescribes and the re strictions which it imposes and the power which it reserves to repeal or alter at will; and upon the power which resides in courts to enforce the due execution of the powers which are granted, or exact forfeitures in case of abuse. It is quite immate-rial what persons may compose the corporation; the individuals

equipment and franchise, or any of its property, real or personal, without in-cluding in and securing by said mortgage all such bonds previously issued, and all other preëxisting debts and liabilities of said corporation."

may all change, but the same duties will rest upon the corpo·
ration. The great weight of American authority is in favor
of the existence of this power. *Morrill* v. *Noyes*, 3 Amer. Law
Reg. (N. S.) 18. *Miller* v. *Rutland, &c. Railroad*, 36 Verm. 452,
and cases cited. *Platt* v. *New York, &c. Railroad*, 26 Conn.
544. *Hall* v. *Sullivan Railroad*, 21 Law Reporter, 138. *Bow-
man* v. *Watken*, 2 McLean, 393, 394. *Union Bank* v. *Jacobs*, 6
Humph. (Tenn.) 515. *Dinsmore* v. *Racine, &c. Railroad*, 12
Wisconsin, 649. *Macon, &c. Railroad* v. *Parker*, 9 Georgia, 377.
*Pollard* v. *Maddox*, 28 Alab. 321. *Allen* v. *Montgomery Rail-
road*, 11 Alab. 454. The course of legislation in Massachusetts
has recognized this as a common law power. *Sts.* 1857, *c.* 178,
§§ 1, 5 ; 1854, *c.* 423 ; *c.* 286, § 3 ; 1841, *c.* 44 ; Rev. Sts. *c.* 39,
§ 83 ; *c.* 44, § 11, *et seq.* The validity of a conveyance, executed
by full authority of a corporation, cannot be questioned by third
parties, on the ground that the corporation itself had no author-
ity to execute it. Although a corporation has exceeded its au-
thority, yet the question cannot be tried collaterally, but it is a
matter between the corporation and the state. In this case, the
Commonwealth stands in the attitude of an individual. The
corporation itself, while retaining the consideration, could not
maintain a bill in equity to escape from its contracts and con-
veyance. *Chester Glass Co.* v. *Dewey*, 16 Mass. 102, and cases
cited. *Parish* v. *Wheeler*, 22 N. Y. 502. The Commonwealth,
taking only a quitclaim title, take subject to all equities of which
they have notice. They succeed to the rights of the corporation,
and to no more. To hold that the Commonwealth can ques-
tion this conveyance would be to hold that they have greater
rights than their grantor had. This cannot be. *Parker* v. *Night-
ingale*, 6 Allen, 344, 345. *Joslyn* v. *Wyman*, 5 Allen, 62. *Tay-
lor* v. *Dean*, 7 Allen, 251. *Vermont, &c. Railroad* v. *Vermont
Central Railroad*, 34 Verm. 1. *Morrill* v. *Noyes, ubi supra.* *Sil-
ver Lake Bank* v. *North*, 4 Johns. Ch. 370.

The validity of the bonds which the mortgage to the defend·
ants was given to secure cannot be questioned in this process.
By common law, clearly the corporation might issue such bonds
A cardinal rule of construction is, that a statute ·vill not be

construed to abridge a common law power, unless its terms are clear. And the cases are very numerous where the literal construction of statutes has been departed from, in order to avoid unjust consequences, and to carry out the presumed intent of the legislature. Dwarris on Sts. 544, 564, 593–595, 606–611, 652, 653. Smith on Const. & Stat. Law, 694, 792. See also *Ex parte Meymot,* 1 Atk. 196, 199 ; *Cole* v. *Green,* 6 Man. & Gr. 872, 890 ; *S. C.* 7 Scott, N. R. 682 ; *Bulkley* v. *Derby Fishing Co.* 2 Conn. 252 ; *United States* v. *Fisher,* 2 Cranch, 400 ; *Staniels* v. *Raymond,* 4 Cush. 316 ; *Stebbins* v. *Merritt,* 10 Cush. 27, 31, 32. The cases arising under the statutes concerning settlements, usury, limitations, taxes, insolvent debtors, intoxicating liquors, and the proceedings of public officers furnish numerous other illustrations. Various bonds not executed in conformity to the statutes which required them have been held valid. *Bank of Brighton* v. *Smith,* 5 Allen, 413, and cases cited. *Locke* v. *Johnson,* 3 Allen, 153. *Pratt* v. *Gibbs,* 9 Cush. 82. *Simonds* v. *Parker,* 1 Met. 513. As a general rule, the forms prescribed for bonds are held to be merely directory. Angell & Ames on Corp. § 254. *Bank of Northern Liberties* v. *Cresson,* 12 S. & R. 306. So county bonds and municipal bonds irregularly issued have been held valid, in the hands of *bona fide* holders. *Mercer County* v. *Hacket,* 1 Wallace, 83. *Gelpcke* v. *Dubuque,* Ib. 175. *Meyer* v. *Muscatine,* Ib. 384. *Moran* v. *Miami Commissioners,* 2 Black, 722. *Woods* v. *Lawrence County,* 1 Black, 386.

The *St.* of 1854, *c.* 286, was not designed to deprive corpora tions of existing rights. Section 1 declared the right to issue bonds for certain purposes. But there were various other purposes for which, by common law, they clearly might issue bonds : as, for instance, to aid in constructing their road ; to dissolve an ttachment ; to submit to arbitration ; to prosecute a writ of replevin ; and to convey property. It might be considered doubtful by some whether they had a right to issue bonds for the purposes named in the statute ; but the giving of authority for these purposes did not abridge their general power to issue bonds for other lawful purposes. *Mobile, &c. Railroad* v. *Talman,* 15 Alab. 472. *Allen* v. *Montgomery Railroad,* 11 Alab. 437, 454. *Union*

*Bank* v. *Jacobs*, 6 Humph. 515. The statute, therefore, does not apply, in any of its sections, to these bonds, which were issued for purposes not therein contemplated.

The provisions as to the form of the bonds are merely direc tory. Four suggestions are grouped together. Neither one is essential. Suppose, for instance, the bonds had been issued at a usurious rate of interest; would they alone, of all usurious contracts, be absolutely void? · All of these provisions were simply designed to secure uniformity. The statute does not enact that, for a failure to comply with them, the bonds shall be void; and a strict compliance with them is not essential to the validity of the bonds. See *Bank of Brighton* v. *Smith*, 5 Allen, 417; *Merritt* v. *Stebbins*, 10 Cush. 27; *Hawkes* v. *Eastern Counties' Railway*, 3 De G. & Sm. 743; *Bargate* v. *Shortridge*, 5 H. L. Cas. 297. To give a different construction would involve consequences most unjust. It would enable the Commonwealth, for its own profit, to compel, in a collateral proceeding, an unwilling corporation to repudiate fair contracts entered into in good faith; although the Commonwealth had knowledge of the contracts before advancing a dollar to the corporation. *Parker* v. *Boston & Maine Railroad*, 3 Cush. 117.

Even if the bonds are invalid, the debt of the corporation remains. They have agreed to give a good mortgage and good bonds. They are equitably bound by their promise to pay for the value which they received, although through accident or inadvertence or mutual mistake the promise is expressed in an invalid form. Must not the Commonwealth respect this equity? *Union Bank* v. *Jacobs*, 6 Humph. 515, and Chancellor Kent's opinion, in note. The Commonwealth is in the position of a subsequent purchaser with notice. 3 Powell on Mortg. 1049– 1058 *a*. *Dale* v. *Smithwick*, 2 Vern. 151. *Card* v. *Jaffray*, 2 Sch. & Lef. 374.

HOAR, J. The question whether the mortgage made to the defendants by the Troy and Greenfield Railroad Company is of any validity against the Commonwealth requires the court to give a construction to the provisions of *St.* 1854, *c.* 286. To ascertain what the legislature intended to authorize or prohibit by

that statute, it will be expedient first to consider what were the powers of railroad companies in relation to the issue of bonds and the making of mortgages at common law, or before the statute was enacted.

There seems to be no reason why a railroad corporation should not be considered as having power to make a bond for any purpose for which it may lawfully contract a debt, without any special authority to that effect, unless restrained by some restriction, express or implied, in its charter, or in some other legislative act. A bond is merely an obligation under seal. A corporation having the capacity to sue and be sued, the right to make contracts, under which it may incur debts, and the right to make and use a common seal, a contract under seal is not only within the scope of its powers, but was originally the usual and peculiarly appropriate form of corporate agreement. The general power to dispose of and alienate its property is also incidental to every corporation not restricted in this respect by express legislation, or by "the purposes for which it is created, and the nature of the duties and liabilities imposed by its charter." *Treadwell* v. *Salisbury Manuf. Co.* 7 Gray, 404.

But in the case of a railroad company, created for the express and sole purpose of constructing, owning and managing a railroad ; authorized to take land for this public purpose under the right of eminent domain ; whose powers are to be exercised by officers expressly designated by statute ; having public duties, the discharge of which is the leading object of its creation ; required to make returns to the legislature ; there are certainly great, and, in our opinion, insuperable objections to the doctrine that its franchise can be alienated, and its powers and privileges conferred by its own act upon another person or body, without authority other than that derived from the fact of its own incorporation. The franchise to be a corporation clearly cannot be transferred by any corporate body, of its own will. Such a franchise is not, in its own nature, transmissible. The power to mortgage can only be coextensive with the power to alienate absolutely, because every mortgage may become an absolute conveyance by foreclosure. And although the franchise to exist

as a corporation is distinguishable from the franchises to be enjoyed and used by the corporation after its creation, yet the transfer of the latter differs essentially from the mere alienation of ordinary corporate property. The right of a railroad company to continue in being depends upon the performance of its public duties. Having once established its road, if that and its franchise of managing, using and taking tolls or fares upon the same are alienated, its whole power to perform its most important functions is at an end. A manufacturing company may sell its mill, and buy another; but a railroad company cannot make a new railroad at its pleasure.

The whole reasoning of the court in the case of *Whittenton Mills* v. *Upton,* 10 Gray, 582, in which it was held that a manufacturing corporation has no power to make a contract of copartnership, applies with much greater force to the transfer of its franchise by a railroad company.

No case has been cited in which the exercise of such a power has ever been judicially sanctioned in this commonwealth, where there was not express legislative authority for it; and the cases in which the legislature has expressly conferred the power, or confirmed its exercise, furnish at once a strong implication that it would not otherwise exist, and afford a solution of the allusion to railroad mortgages which occurs in the statutes.

Coming, then, to the consideration of the statute of 1854, we find it entitled "An act to authorize railroad companies to issue bonds." The first section recites the purposes for which a railroad corporation may issue bonds, namely, "for the purpose of funding its floating debt, or for money which it may borrow for any purpose sanctioned by law." This is, on its face, merely permissive. But it presents this alternative of construction. Either the corporation did not, in the view of the legislature, have the right to issue bonds without the permission, in which case all the conditions and limitations attached to the privilege must be held to qualify and define the extent of the permission given; or if the full right existed when the statute was passed, then it seems impossible to give any other sensible meaning to its provisions, except to construe it as prescribing the conditions

Commonwealth *v.* Smith & others.

and limitations under which the power might thereafter be exer-
cised. The question is, did the legislature intend that these
companies should be allowed to issue bonds only in the mode
and for the purposes authorized by the statute? If that inten-
tion is made apparent, it makes no difference whether the lan-
guage is affirmative or negative. The same section, then, con-
tains two provisions : first, that the issue of bonds shall be
authorized by a majority of the stockholders, at a meeting called
for the purpose ; and secondly, that the amount of bonds issued
shall not exceed the amount of capital actually paid in. The
second section provides that such bonds may be issued in sums
of not less than one hundred dollars each, payable at periods not
exceeding twenty years from the date thereof, and at a rate of
interest not exceeding six per centum per annum, payable annu-
ally or semi-annually. The language is still affirmative and
permissive, but strictly limiting the nature and extent of the act
allowed. The third section enacts that no railroad corporation,
having issued any bonds under the provisions of the act, shall
subsequently make or execute any mortgage upon its road,
equipment and franchise, or any of its property, without includ-
ing in and securing by said mortgage all such bonds previously
issued, and all other preëxisting debts and liabilities of said cor-
poration. This section certainly implies that a railroad corpo-
ration may mortgage its road and franchise under some circum-
stances, but gives no direct authority to make such a mortgage ;
and it plainly prohibits any mortgage which does not conform
to the rule imposed. The fourth and fifth sections provide secu-
rities for the correct issue of the bonds, and for making them
binding on the corporation, though sold at less than par.

The court are all of opinion that the statute was intended to
prescribe the terms and conditions on which railroad corpora-
tions should thenceforth be allowed to issue bonds, and that any
bonds which have been issued since its passage and do not con-
orm to those conditions are made in violation of law, and are
therefore void. We cannot suppose that the legislature could
intend to pass an act to make legal certain bonds which the cor-
porations had full power to issue without such authority, and

which would leave all other bonds of equal validity. It must be remembered that these corporations are bodies created for public purposes; that their charters are made subject to repeal or alteration at the pleasure of the legislature; and that the Commonwealth has reserved full power to regulate and control their action by general or special laws. The language of the statute is in substance this : " Such are the bonds which railroad corporations may henceforth issue." To declare that they may be issued on certain fixed conditions is, in effect, to enact that they shall not be issued in any other manner.

That bonds issued in violation of a statute are void, was held in a recent case in the queen's bench in England — *Chambers* v. *Manchester & Milford Railway*, 26 Law Reporter, 583. The prohibition in the statute on which that case depended was more direct, but the principle applicable to it is the same, and rests upon strong and just foundations in reason.

The bonds issued by the Troy and Greenfield Railroad Company for securing which the mortgage held by the defendants, as trustees, was made, are payable at a period exceeding twenty years from their date, and were issued to an amount very largely in excess of the amount of capital stock actually paid in. The legislature did not mean that such bonds should be made. Their illegality is apparent upon their face, and open equally to the knowledge of the party who issued and the party who received them.

The bonds being invalid, the mortgage to secure them is invalid likewise. It becomes unnecessary, therefore, to consider the questions which have been so largely and ably discussed in the argument, to what extent the power to make a mortgage of a railroad has been recognized, or exists by implication under our statutes, and especially whether such a power is conferred, to any extent, by the statute of 1854. But it may be well to observe that the object of that statute seems to have been exclusively the regulation of the issue of bonds by railroad corporations; and that mortgages are only mentioned incidentally with reference to the future security of the bonds, and not with any view of defining or extending the general power of making

mortgages. And further, we understand the bonds which are the subject of the statute to be only bonds for the payment of money, constituting a funded debt of the company; and do not consider the opinion which we have expressed to have any application to bonds for other purposes, and of a different character, such as bonds to dissolve an attachment, for the conveyance of land, or the like. Nor do we mean to decide that some of the provisions of the statute may not be merely directory.

We find no evidence that the Commonwealth has ever known and sanctioned the irregular and illegal issue of the bonds in question, either directly or by implication. Nor do we think that they fall within the class of cases in which it has been held that a violation of corporate powers cannot be taken advantage of collaterally. The second mortgage to the Commonwealth gives it a direct interest in the property, and, not being made expressly subject to any prior incumbrance, gives the right to maintain and prove that the supposed conveyance to the defendants was illegal and void.

The result to which the point decided leads is this: that, the defendants having no title which they can maintain against either of the mortgages to the Commonwealth, the plaintiffs have a plain, complete and adequate remedy at law for any interference with the mortgaged property, and the bill must be dismissed.*

---

* The following case from Middlesex County, involving similar questions, was argued in February 1865 in Boston : —

EAST BOSTON FREIGHT RAILROAD COMPANY *vs.* GARDINER G. HUBBARD & another.

TORT, in the nature of trespass *quare clausum.*

It was agreed, in the superior court, that in November 1855 the Grand Junction Railroad and Depot Company, having before then at five several times issued bonds amounting in all to $1,140,000, which all remained due, and portions of which were secured by mortgages upon different parts of their railroad, issued other bonds to the amount of $100,000, which were secured by a mortgage to two trustees, upon another part of their railroad. The company at the same time owed a floating debt of about $100,000, which was not included in the mortgage; and the amount of capital stock paid in was $792,291.66. In 1856

the company became insolvent, and in April 1862 George W. Gordon recovered judgment against them for $25,667, and the sheriff levied his execution upon their franchise, and sold the same, with all the rights and privileges, so far as related to the receiving of tolls, for the term of ninety-nine years, by auction, for the amount of damages and costs in the execution, to the plaintiffs, who by their charter were authorized to lease or purchase the same.

One of the original trustees in the mortgage of November 1855 afterwards died, and the other resigned; and the defendants were appointed in their place, and entered upon the premises described in the mortgage for the purpose of foreclosure.

Upon these facts judgment was rendered for the plaintiffs, and the defendants appealed to this court.

*S. Bartlett & G. G. Hubbard,* (*H. W. Muzzey* with them,) for the defendants.

*J. G. Abbott & B. Dean,* for the plaintiffs.

HOAR, J. The title of the plaintiffs is good, unless the defendants can show a paramount title; and the question is on the validity of the mortgage under which the defendants claim. It was made to secure $100,000 of bonds issued by the Grand Junction Railroad and Depot Company in November 1855; the corporation owing at that time $1,140,000 of bonds previously issued, and its whole capital then actually paid in by the stockholders amounting to $792,291.66. The bonds were therefore issued in direct violation of *St.* 1854, *c.* 286, § 1, and the mortgage is affected by the like illegality. *Commonwealth* v. *Smith, ante,* 448. A further objection to the mortgage is, that it seems to have been made in disregard of § 3 of the same statute; there having been outstanding liabilities of the corporation at that time to the amount of $100,000, which were not secured by it.

If these objections were not sufficient, it might be very difficult to find what legal effect a mortgage of the franchise of a railroad company over a portion of ts road could have, or how it could be supported for any purpose

*Judgment for the plaintiffs upon the facts agreed.*